We'll call our last case of today, which is now in the afternoon. Carvalho-Grevious v. Delaware State University et al., No. 15-3521. Mr. Karff and Jim Taylor. Mr. Burke? I'm sorry, I have the old one. It's Mr. Burke and Mr. Taylor. Ms. Burke, Ms. Burke. Ms. Burke, Karff is out, Burke is in. I have the old. My apologies. Good afternoon, Your Honors. May I please report Christine Burke on behalf of the appellant Millicent Carvalho-Grevious. If it respectfully, I'd like to reserve five minutes for rebuttal. That's fine. Since we're shifting gears here, Your Honor, to this employment discrimination or retaliation suit, although I assume that you're well versed in the facts recited by the parties, I think a brief discussion of the record is appropriate as to these retaliation claims. The time period that we're dealing with is pretty narrow. Are you focusing primarily on being removed as chairperson, or are you focusing primarily on taking the renewable contract and making it a terminal contract in June of the applicable year? Both, Your Honor. The only two materials- Isn't the second one much stronger than the first? I would argue that they're equal, Your Honor, based on the temporal proximity. Why? Temporal proximity, as we all know, is certainly a factor. But as Judge Amber's question suggests, the latter claim, that is, the reduction in the period or the change in her contract status, didn't follow the kind of rejection of her that necessarily was part of her loss of her department chairmanship. And she was subject to an election by members of that department, and she was rejected as a sitting chair. That's a significant fact that is not present in the latter claim. And that was a significant fact for the district court. However, irrespective of whether or not the department elected her out, which is customary each year that a department chair holds term, she's entitled under the contract to finish out the term through June. She got the salary. She got everything but the title. She was removed from the position sometime in May. She still was paid as the chair. And also the faculty preceded that three months before by saying, in effect, a vote of no confidence. That's what I was referring to. And don't we have to look at the facts, as the district court did, that the important overlay here was that there was a very important assessment being done of the department, and apparently for purposes of the accreditation, not all was going well. Not to attribute it all to her by any means, but there was a process going on here that was driving much of what people were doing. So then the question, it begs the question, what motivated their actions? Before I get to that briefly, though, the fact that she was removed as department chair and her pay status remained consistent for the remainder of the term, we submit that that action still constitutes a materially adverse action under the Supreme Court jurisprudence in Burlington and was not disputed by the parties. But putting that aside, the dean as well as the provost had every opportunity, if they wanted to, to remove her when there was a 5-4 vote to oust her from the position. They could have done so in February. They could have done so in March. Because they didn't, you're saying that they were trying to be an act of generosity, kindness, whatever you want to call it. They let her stay on for a while and then finally said things got so tough that they're going to continue to pay her until the time is over. But she's going to be removed. The question is what changed, though, Your Honor? Hadn't she been appointed as chair for the academic year? She was appointed as chair for the academic 2010-2011 year. Right, so didn't that run until the June vote? So to say that she could have been removed, you'd be here making a similar argument if she was removed in February as opposed to May. Well, the question is what happened in May when they removed her that prompted their actions? Did it have to happen in May? Wasn't there a need to at least request an extension for purposes of the evaluation that was being done for accreditation? And so on April 11, 2011, they were actively representing to a third party in connection with their need and desire for more time, that Ms. Grievous would, in fact, be staying on as the department chair through June of 2011. So based on their own actions and representations, the provost had no intention, at least as of April 11, 2011, of removing her as chair. Let's go back to my initial question. You have two claims. One, removal as chair. We're telling you we have real problems with it. The second one is in connection with taking a renewable contract and making it a terminal contract within a couple of weeks after the university found out that she had filed an EEOC claim in May of 2011. Isn't that your stronger argument? I think that if you're looking at the legal issues at play, including temporal proximity, which is there for both claims, Your Honors, and credibility, could a jury reasonably reject the reasons that are asserted? I'm not contending that there isn't some legitimate non-discriminatory or non-retaliatory reason. The argument you have on the second claim is that purportedly she was told on August 2nd that the real reason that they changed the contract was because she filed the EEOC claim, and we'll get to that as to what the weaknesses are of that. Secondly, there was supposedly a contemporaneous memorandum of the provost, when in fact that memorandum was a one year later. It wasn't contemporaneous. It was a one year off. Even if it was three weeks off, two weeks off, it would not be contemporaneous. Therefore, you have a decent argument. Then the problem you have with the argument is the deposition. By the way, she goes by Grievous? Dr. Grievous, yes. Even though normally it would be Carvalho. Carvalho Grievous in Portuguese normally would go by Carvalho, but you're saying she goes by Grievous? She prefers to go that way. So be it. She has a hyphenated name on her email signature. In her deposition, she was asked if there was anything else, and she never brought up the August 2nd conversation. Her answer was nope. So two points, Your Honor. Their argument respecting the credibility or their assertion that this court should reject, outlay any contentions that those statements were made to her is based on the fact that she's trying to catapult herself past summary judgment of the sham affidavit rule. The statements that she made to the EEOC were within 10 days when she had the conversation. Well, she did a couple of letters. Two separate letters made within 10 days of when she had her conversation with Provost Thompson, August 12, 2011. Two separate letters both saying that she was specifically told that the reason why they didn't renew her contract was because she had filed a complaint with the EEOC. Her deposition was in April of 2015, almost four years later, and the particular question at issue is a similar confusion that the district court had with when these particular meetings happened. The conversation that counsel was asking about was a July conversation. When you say these EEOC complaints, August 12, and I think the second letter was September 10. What year was that? 2011, Your Honor. In 11, she actually wrote those? Yes, Your Honor. Okay, and when did the deposition take place? April 2015. And so she knows about the letters beforehand, and yet in her deposition she answers, when the lawyer asked her if there was any further discussion or feedback from him, that was the provost, about the reasons for the non-renewal of the contract. Grievous responded, nope.  There was a meeting in August of 2011, which was the month immediately following their decision. So this deposition was about a July meeting? Specifically preceding that question references what happened during the meeting in July, which I pointed out in my reply brief. Okay, JA83. I think there was some significant confusion between counsel and my client about which specific meeting. You may be right. Let's just go to JA83. I guess it's, what, page 235? JA83, Your Honor? Yeah. And so on page 230, counsel says, right, was there a meeting in July? Answer, yes. Question, I'm asking about the July meeting and the questioning and testimony pursues thereafter. Her position at the EEOC was that she had a meeting with the provost in August of 2011. These are two completely different meetings. It wasn't until a subsequent July meeting in 2012 that she was given her, quote, due process opportunities, which they never gave her before, to sort of make her case and explain why she was a sufficient faculty member and why she deserved to remain as a tenured employee. Ms. Burke, don't you want to make some argument on your bus floor, on your NASA argument? I want to discuss that because I think that's one point that myself and my opponents may actually agree upon. Even if, in fact, we say that my client has to establish but-for causation, meaning that her complaints were the determinative factor of why they took the actions that they did, I think she still has presented sufficient evidence to get to a jury. What I disagree with the district court is that at the prima facie level, there is a relatively low burden. The district court got that wrong by importing it into the prima facie. I think it was inappropriate, Your Honor, yes. That still doesn't get you out of dodge, right. As to the timing, I mean, the district court uses the term coincidence. I mean, the reason for coincidence is when you take an action contemporaneous with legally protected activity, it begs the question, and a jury would wonder, did it have to do with the actual complaint that was made or any other reasons? In this particular circumstance, every single incident that they point as her being, you know, in discord with her coworkers were very early on in her employment. Most of them they cite to her within several days of August, the first couple months. My client met regularly with Dean Austin on a weekly basis to discuss feedback, the department, et cetera, and not at any point had he related to her. He had concerns with her ability to handle that department. The first notion that he ever memorialized in any document, I know I'm out of time, was within a day after he met with the provost and was notified that she had alleged discrimination. I have to get back on rebuttal, Your Honor. That's fine, we'll get you back on rebuttal then. Thank you, Your Honor. Thank you. Mr. Taylor. Good afternoon, Your Honors, and may it please the court, Jim Taylor on behalf of the appellees. Is it true that you could agree with Ms. Burke that under Nassar, the real reason of a but-for test should belong at step three as opposed to being encrusted onto the prima facie case, which is supposed to be a low bar? Yes, sir. Okay. This court decided in June after briefing. We have a non-presidential opinion. That's correct. Young versus City of Philadelphia. Correct. And that's consistent with the approach that has been taken by the other circuits. I don't think it changes the analysis here. It's still a but-for test. Let me pick up on the June 2011 issuance of the terminal letter. As we know, record is that the April letter was issued, and Dr. Thompson, Provost Thompson's deposition testimony is unchallenged on this point, that at the time that he had to make that decision under the collective bargaining agreement, whether to keep Dr. Grevious for one more year, at least one more year, he had to make that decision by April 1st. And his testimony was, I had my doubts, I had my questions, I wasn't sure if it was going to work out, but I needed to make that decision, so I erred on the side of renewing for a year. Having time to make a follow-up decision about whether or not to retain Dr. Grevious beyond that, that decision separately set forth in the collective bargaining agreement had to be made by December. There is no evidence in the record that Dr. Thompson knew of the filing of the EEOC charge. With regard to the chairperson capacity? I'm sorry. He did know in June, did he not?  There is no evidence in the record. The chair did. The university received it. The general counsel's office had it. There is no evidence in the record that Dr. Thompson knew of it, and so let me tell you what's very clear in the record. Dr. Thompson said, back up, in our interrogatory responses we conceded the university received it most likely in early June. It was filed, I think, on May 20th. Correct. We weren't able to say for certain who had it. We knew the general counsel's office had it. Dr. Thompson said that he had no recollection of having seen it before the issuance of the June letter. He was aware of it by the time he met with Dr. Grevious in August. Then, in Dr. Grevious' testimony, and here's why I think you have no fact dispute before you, and here's why I think you can disregard her self-serving statements to the EEOC in the writing. In her deposition, I asked her, did Dr. Thompson know, did he tell you that he knew of the EEOC charts? She said, I have no idea if he knew. I don't know. She probably didn't. But then that doesn't support her later statement that he told her that he was issuing her the terminal letter because of his knowledge of the EEOC charts. But she was first twice to the August 2nd conversation, and fairly shortly thereafter. For the district court to say that she had to corroborate that, that's impossible. I mean, it's literally impossible. You can't corroborate it. I mean, unless she, I suppose, she went out immediately and told a friend, or put it on Facebook or something, I don't know. I mean, but normally those one-on-one conversations can't be corroborated. So what you, I agree with Your Honor, of course, that corroboration is an interesting word and an interesting standard. But here's what we have in this case. Her own testimony refutes that very position she took. And the argument there is that the first few pages before that referred to a July conversation, and she didn't understand it referred to the August 2nd conversation. Because that's the only thing you've got going for you with regard to whether there's a material issue or fact. Corroboration doesn't work here, and the idea that there was a contemporaneous memorandum that was written on June 22nd a year later doesn't work, obviously, because it was just an error in terms of understanding that 15 was, or whatever, it was coming off. Correct, Your Honor, we all agree that that was not a contemporaneous memo, it was a year later. So then what you've got to show is that in the affidavit, or in the deposition, that she clearly said in connection with August 2 that she doesn't recall anything else other than the provost telling her that she was a troublemaker. So let me respond in a couple of ways if I may. Number one, I think it's enough that in her deposition in page 176, JA 68, she was asked if she knew whether Dr. Thompson was aware of the EEOC filing when he issued the terminal notice. Was he aware when he issued the notice on June 21? She said, I don't know, I have no idea. If that's so, that's her own testimony. It's not even a corroboration issue. That relates back to June. We're now going fast forward to August. He did know by then, and he said something contrary to what she understood with regard to June. I don't see the tension. If I may, the reason why June matters is because it only, I submit it only matters what he knew before June 21, the issuance of the terminal letter. It is undisputed that he said that he learned of the EEOC charge at some point between then and the August meeting. But it only matters for purposes of causation and retaliation what he knew prior to the issuance of the terminal notice on June 21. And in that regard, Dr. Grevious says that he told her, I did this because of X, and yet that was missing my point. What she's saying is she didn't know if he knew in June. The question was, did he know what he knew in June? So I'm going to get to your August point in a second. I just want to go back to this one more time. If in fact she doesn't know what he knew in June, that can't meet the but-for test. Because he issued the terminal letter on June 21. Let me talk about the August meeting. Okay, because it really comes down to the August meeting. So let me talk about the August meeting. I think there is confusion, but I don't think it's a fact dispute. I think that there is no testimony that I've seen supporting there being two meetings with Dr. Thompson. I'm only aware of one. The complaint, plaintiff's complaint. Well, on page 230, you were referring to a July conversation, were you not? Yes, or Ms. Burke was. It might have been her questioning. But there was a reference to a July meeting. I think that was a July meeting. I put a reference to it because I think that's when Dr. Grievous said it occurred then. In her complaint, she described it as an August meeting. In her filings contemporaneous with the EEOC, she described it as an August meeting. Right, August 12th and September 10th, right. And I'm only aware of one meeting. I don't think there's anything in the record suggesting that there were two. So I would submit that her description of the meeting in her deposition, which she might have said July, but her description of it. You might be right. But how am I, based on this record, to know that? Two answers. One, her description of it is entirely consistent, almost verbatim, but entirely consistent with her description of an August meeting in her complaint. And I can get you on her site for it. I just don't have it at my fingertips. But she refers to it as an August meeting. And when she refers to what happened during that meeting, if you match up the description in the complaint of the August 2 meeting and the description in the deposition, they're very close. Number two, if there was a question, it's the appellant's obligation here to satisfy the but-for prompt. And if there was a question about which meeting she was talking about, that would, if I submit, have been appropriate to submit an affidavit to the court and say, here's when Dr. Thompson was asked in my deposition about an August meeting. And here, during the August meeting, Dr. Thompson said X. Nothing inappropriate about that under Rule 56. In fact, I think that's what Rule 56 would call for. And I don't think that would be a sham affidavit because it wouldn't have been testimony that was covered during the deposition. So on three occasions, Dr. Grievous had an opportunity to testify under oath that this is what Dr. Thompson said in her deposition, before EEOC in sworn statements, or in a Rule 56 affidavit. She took none of them. Instead, her only sworn testimony, including her original filing at JA 295 before the EEOC, which is a sworn document, and this is coming on September 28, 2011, again, very close in time to the original actions. Her only description there is that, I asked Dr. Thompson if he was aware that I had recently filed a charge of discrimination, and he indicated that he was. Again, each opportunity she had under oath to say, Dr. Thompson told me the reason he took this action was because of my EEOC filing, she didn't take it. And instead, and I know I'm belaboring the point, but instead, in her deposition, when she was asked, do you know if he knew, if Dr. Thompson knew, before he issued the terminal letter that you would file the EEOC charge, her answer was, I have no idea. If that's so, I submit that cannot satisfy the fourth prong at the third stage of the McDonnell-Douglas analysis. Thank you very much. Thank you. Ms. Burke, I'd like to start with a, just, when you look at this record, all of us, we've all been in situations where it's just not a good fit. It's, you know, I always say to people, two or three things count in life. Do you like what you do? Do you like with whom you do it? And are you reasonably compensated? Here, she may have liked what she was doing, but from the get-go, she didn't like the people with whom she was with. And they understood it specifically on the other side. This, you know, again, maybe it's just big picture and maybe it's got nothing to do with this particular case, but this wasn't going to work out. For whatever reason, I don't know why. Viewing the facts in the light most favorable to Dr. Griebus, and I think the term she used in her deposition was sacrificial lamb, this department was used isolationist, it was up for reaccreditation, there were a lot of personnel issues that were going to come along with that. Following up on Judge Ambrose's question, in less than two weeks after she was hired as chair, hired on August 3, 2010, and on August 15th, which is 13 days, 12 days later, she starts her new job and she emails Dr. Austin and is complaining about Sherita Brown. Complains about her faux job title. Took that long for her to have problems with Sherita Brown. And Sherita Brown goes on to, I think, make some kind of complaint to Dr. Austin about her. Now, there was no sacrificial lamb at that point in time, right? Too early. My point, Your Honor, respectfully, is that as a sacrificial lamb, her job was to come in and review these people's job titles, which I'm sure they did not want to occur, what time they were spending, the syllabi that were in place, what they were doing with the classrooms. So she was going to necessarily get pushback, which the provost agreed in his deposition and said people do not like change. And Austin's deposition testimony concedes that he did not think it was either informal or discipline worthy for any of the personnel changes she either recommended or implemented. But it looked like come, I mean, we all understand academic situations, but it looked like come January, February, that the situation had become toxic. There had definitely become a discord between the manner in which the governance of the department was going to be run and the handling of the consultant that was hired to assist with the reaffirmation process.  According to the provost, however, this review of whether or not to reappoint someone in April is not perfunctory. There's three different levels. You get an actual list from the dean of those up for reappointment, and you review the list, and you review for any red flags whatsoever. He gave a clear list of options, and at that point in time, they could have determined whether or not she was suitable for reappointment, and they affirmatively chose to offer her a renewable contract. They had up until December of that year to change their mind, and the only point in which they changed their mind was when they got notice of the EEOC charge. Now, in terms of knowledge, I specifically disagree that the provost did not have knowledge. Irene Chapman Hawkins, the HR manager, testified on JA 161 pages 18 to 19 that her standard and normal protocol is to notify general counsel immediately and the provost immediately. So assuming that's true, a jury could reasonably conclude that the moment that the university got notice of the charge, they notified general counsel and they notified the provost. She testified they don't notify the president, so the individual decision maker here was, in fact, the provost. So any contention that he did not have knowledge of this decision, I think, strains the record. I just have one more moment of rebuttal time, and I think the overriding question is what motivated their actions, and if, in fact, the university is going to contend that it was poor performance, a lot of the incidents that they point to are well in advance of any of the actions that they took with respect to her continued employment. She was removed based on a 5-4 faculty vote. It wasn't a landslide in February of 2011, and it was not until she met with HR, and I see that the district court as well as DSU want to say, well, let's just look at one complaint and look at that in terms of temporal proximity, but I think from a retaliation standpoint, when you have an individual who goes from making e-mails, it's told by the provost, couch it as a grievance. Oh, no, couch it as a grievance. I can't consider your complaint. Go to HR. And she does, in fact, escalate her complaints up through a federal government agency. That has some significance on their intentions regarding her continued employment. Thank you very much. Thank you to both counsel. Well done. We'll take the matter under advisement and adjourn for the day.